Filed 12/2/22  In re M.Z. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.Z., a Person Coming Under the Juvenile Court Law. | B314485 (Los Angeles County Super. Ct. No. 20CCJP02356I) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>Y.L. and D.Z.,<br><br>        Defendants and Appellants. | |

APPEALS from an order of the Superior Court of Los Angeles County.  Diane C. Reyes, Judge Pro Tempore.  Affirmed.

Jesse F. Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant Y.L.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant D.Z.

Dawyn R. Harrison, Interim County Counsel, and Kim Nemoy, Assistant County Counsel, for Plaintiff and Respondent.

_____

Y.L. (mother) and D.Z. (father) (collectively parents) have nine children together, all of whom are dependents of the juvenile court.  In this appeal, parents challenge the juvenile court's jurisdictional findings and removal order as to their youngest child, M.Z. (son), who was born during the pendency of the proceedings below.  We find no significant or substantive change in the parents' behaviors or attitudes since we issued our opinion in parents' initial appeals from the underlying proceedings.  (*In re W.Z.* (Mar. 11, 2022, B309689 [nonpub opn.]).)  We conclude substantial evidence supports both the juvenile court's jurisdictional findings and removal order.  Thus, we affirm.

## BACKGROUND

1. **Underlying Dependency Proceedings and First Appeal**

The underlying dependency proceedings began in 2020, before mother and father's three youngest children, including son, were born.  During the pendency of the underlying proceedings, mother gave birth to twin girls and, most recently in April 2021, to son.

In December 2020, the juvenile court declared mother and father's eight older children dependents of the court and removed them from mother and father's custody.  The court's findings and orders were based both on father's egregious sexual abuse,

2

including rape, of his oldest daughter (son's half sister) when she was a minor, which abuse resulted in half sister giving birth to father's daughter, and mother's failure to protect the children from father. The juvenile court ordered mother to participate in individual counseling and conjoint counseling with her children if recommended by their therapist. The court ordered father to participate in individual counseling and sexual abuse counseling for perpetrators. The court also ordered mother and father to complete "mental health counseling through a 730 evaluation" and granted monitored visitation for both mother and father. The juvenile court repeatedly ordered parents to cease posting on-line confidential information concerning the case, judicial officers, social workers, and other individuals involved in the matter.

Mother and father each appealed the juvenile court's December 2020 orders. Mother and father did not challenge the juvenile court's jurisdictional findings, removal order as it pertained to their younger children (including at the time their infant twins), or other dispositional orders. Mother and father challenged only the juvenile court's removal order as it pertained to their oldest son, who was 13 years old at the time the underlying proceedings began. In an unpublished opinion, we affirmed the juvenile court's removal order. (*In re W.Z.*, *supra*, B309689.) Rather than repeat the facts of this case up to the point of parents' first appeal, we incorporate by reference our opinion in B309689 (first appeal).

## 2. Events Since First Appeal
### a. Son's Birth
In April 2021, after parents' older children had been removed from parents' custody and parents had been ordered to

participate in family reunification services, mother gave birth to son.  Mother and father were not forthcoming about son's birth and resisted inquiries from the Los Angeles County Department of Children and Family Services (Department) concerning son's well-being.

### b.    Mental Health Evaluations

In May 2021, a Department social worker spoke with Dr. Johnny Wen, who performed mother's and father's mental health evaluations ("730 evaluations").  Dr. Wen told the social worker it was a challenge to schedule and conduct the parents' evaluations.  He "had concerns regarding the parents' mental health."  Although Dr. Wen stated mother and father could function, he was "concerned about [father's] Antisocial personality disorder" and was "very concerned" about newborn son being in their care.

Dr. Wen told the social worker he diagnosed father with a "Delusional Disorder, with Antisocial Personality Disorder."  Dr. Wen reported father had "poor boundaries as evidenced by the father's behaviors at the Doctor's office as well as during the evaluation and this behavior of having poor boundaries can affect his boundaries with his family at home."  Dr. Wen was concerned about father's "Axis II diagnosis," noting "father exhibits deviance from what is acceptable in society, lack of insight into his past behaviors or what brought [Department] involvement into this [*sic*] life and his lack of conscience and remorse of hurting others or those he has hurt, for example, the rape of his co-worker in China and the sexual abuse of his now adult daughter."  Dr. Wen told the social worker, "Father lacks an understanding that he has hurt people and without services put in place, he will continue his behaviors."  Dr. Wen also expressed concern for child safety, explaining father's behavior could "lead

4

to the parents not allowing access to medical care for [son] and the father's delusions are able to prevent care to the baby."

As to mother, Dr. Wen told the social worker mother enables father's behavior and "appears to be afraid to disagree with" him. Dr. Wen said mother seems "to protect the father and the pair do not like to, and are not willing to, be separated." According to Dr. Wen, "[M]other depends fully on the father, and is in denial about the father's history of sexual inappropriateness." Although mother told Dr. Wen she is educated and believes in science, she believed "the DNA proving the father's impregnation of his now adult daughter, is a plot used by the Chinese Communist Party against them." Dr. Wen indicated mother seemed to have a " 'husband first' attitude."

Dr. Wen concluded father's "mental health indicates that while father's suffering from a Delusional Disorder, absent of the personality disorder, does not deem him an unfit parent, 'the combination of the circumstances related to his first daughter, history of incarceration, continued lack of remorse and antisocial behavior and influence upon his spouse that would warrant the degree of clinical concern for any minors under his care . . . **[Father] should not have a minor under his care.**' " As to mother, Dr. Wen stated, " '[Mother] is unable to independently care for her children without relying on her husband. [I]t is unlikely she would be leaving her situation given the circumstances shared. As a whole, I am doubtful for any immediate change on her part given her poor acculturation, isolation, shared delusional beliefs, and her lack of initiative. From a clinical standpoint, I am doubtful she will seek any educational resources that can be afforded to her. I am just as doubtful that any progress made will be impeded in a

5

multidirectional way by her husband['s] actions.  The impedance by her husband will likely **pose mental health and safety concerns for any minors under their care.**' "

### 3.    Instant Petition and Son's Detention

In late May 2021, when son was approximately two months old, the juvenile court granted the Department's application to remove son from mother and father's care.

A few days later, on June 1, 2021, the Department filed a Welfare and Institutions Code section 300 petition on behalf of son (petition).[1]  Like the Department's earlier petitions in this matter, the petition alleged counts related to father's sexual abuse, including rape, of half sister and mother's failure to protect son's siblings.  These allegations were brought under section 300, subdivisions (b), (d), and (j).  Those counts also alleged father failed to participate in either court-ordered counseling or a sexual abuse program for perpetrators, mother failed to participate in court-ordered counseling, and both parents continued to violate court orders by posting confidential information on-line.  Finally, the petition included an additional subdivision (b) count, which alleged father has mental and emotional problems that make him unable to care for son and mother failed to protect son from father.

In its June 2021 detention report, the Department stated mother and father had not completed or even begun most of their court-ordered family reunification services and, in violation of court orders, continued to post confidential case information on-line.  Mother said she was "waiting for [the Department] to pay for the classes before she can start."  Father similarly stated

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

6

he was "waiting for counseling class" and noted he had taken a parenting class, during which he learned some helpful information but believed some of the information was "misleading and not practical." Father also reported he had attended two sexual abuse counseling sessions, but they stopped and he did not know why. Father wanted the Department social worker to know he was making an effort "to do the services."

Generally, mother and father continued to be uncooperative and paranoid. Father was overheard at one visit telling his children "not to 'leak' information to the social workers." Father also continued to repeat his claims of a grand scale Chinese Communist Party conspiracy against him and his family. The Department noted parents "have delusions that occupy them and believe their family has been targeted and victimized by the Chinese Communist Party and this has contributed to the many failed intakes with various services providers and their decision to not service the family" and "parents continue to lack insight and acknowledgement of having a case with [the Department], expressing that they are wrongly accused."

The initial detention hearing was held on June 3, 2021. Neither mother nor father appeared, although father was represented by counsel. The juvenile court made emergency findings detaining son from parents. The court continued the hearing to the following day. A Department social worker left multiple messages for both mother and father concerning the continued hearing. Father appeared for the hearing but mother did not. At the hearing, father unsuccessfully sought to represent himself, interrupted the court, and strenuously objected to the court's involvement. The juvenile court detained son from parents and again admonished father to cease posting

information about the case on-line (for example, father recently had posted son's caregiver's name and photographs of her car and license plate on-line). A few days later, the juvenile court held an arraignment hearing for mother, who again did not appear. Although father was present for that hearing, he remained outside the courtroom because he refused to power off his phone and place it in a designated bag, which protocol had been implemented to ensure father did not record the confidential court proceedings. The juvenile court appointed a guardian ad litem for mother. At a June 23, 2021 hearing, mother again did not appear and father again interrupted the proceedings despite being represented by counsel. The juvenile court noted mother appeared to be "voluntarily absenting herself" from the hearings.

### 4. Adjudication and Disposition

In July 2021, prior to the adjudication hearing, the Department submitted its jurisdiction and disposition report for the court. Mother and father declined to be interviewed for the report.

The Department noted both parents had completed a 15-hour parent education program. As to the parents' court-ordered individual counseling sessions, the Department explained it had secured funding to pay for, and was assisting parents in scheduling, their sessions. In May 2021, after approximately four months of failed attempts to schedule parents' individual counseling sessions, mother and father each had an intake session. Soon after, the parents complained their assigned therapists were inexperienced and requested different therapists. The supervisor at the counseling center reported, " 'This couple is very challenging to work with. They blamed our administrative workers. They accused us of going after them,

8

and that we are going to harm them.  They accused our therapists of being inexperienced, as of [*sic*] they are not married, and they do not have any child.  So they felt that our therapists could not teach or help them with parenting or relationship issues.  The mother also asked for counseling record after each session.  We agree with that, but we need them to sign a consent for the release of information.  They questioned and stated that they are entitled to their own record.  They refused to sign the consent. . . . In regards to the change of therapist, we managed to switch the father to a LCSW, but we are not able to switch for the mother, due to no available therapist.  However, both parents need to confirm their participation in services by this Friday . . . or else we will need to close out the case.' "  Father told a Department social worker the requested consent form was misleading and would be used to "trick them."  He asked the social worker to find a new provider but, if one could not be found, father said, " 'it's okay.' "

The Department also secured funding to pay for father's court-ordered sexual abuse counseling program.  However, father struggled to participate in that program as well.  Father insisted on taking photographs of his counselor without her consent and argued with her about his family's case.  The counselor did not believe she could help father and "felt it was only right for her to stop servicing the father."  Eventually the Department found a different counselor who agreed to see father.  As of the date of the Department's report for the court, father had not yet had his intake session with that counselor.

Finally, despite constant admonishment from the juvenile court and others, father continued to post on-line confidential information about the case and personal information about social

workers and caregivers. Father's conduct disrupted his children's placement and his ability to access court-ordered services. Father believed it was "crucial" that he post this information so people could know what had happened to him and his family. "He stated that he did it to protect his family and himself." Father said he would accept any penalty for his violations of the court's orders.

In its report, the Department urged the juvenile court to sustain the petition. The Department noted the parents had not participated in most of their court-ordered programs and had not addressed their mental health issues. Mother and father lacked insight into, and took no responsibility for, their actions. The Department stated the parents had been uncooperative, secretive, and continued to espouse paranoid beliefs, all of which created barriers to the assistance available for them and their family. The Department believed son needed "continuing protection from the parents."

The jurisdiction and disposition hearing was held August 3, 2021. At the hearing, the juvenile court sustained the petition, found son was a person described by subdivisions (b), (d), and (j) of section 300, and declared son a dependent of the court. The court ordered son removed from parents' custody and ordered reunification services and monitored visitation for both mother and father.

## 5. Instant Appeals

Mother and father each appealed the juvenile court's August 3, 2021 findings and orders.

### DISCUSSION

In our opinion addressing parents' first appeal, we discussed our Supreme Court's decision in *In re I.J.* (2013) 56

10

Cal.4th 766, concluding it "offer[ed] strong support for the juvenile court's removal order" as to mother and father's oldest child.  (*In re W.Z.*, *supra*, B309689.)  Similarly, here, we conclude our Supreme Court's reasoning in *In re I.J.*, *supra*, 56 Cal.4th 766, governs mother's and father's instant appeals and supports both the juvenile court's jurisdictional findings as well as its removal order as to son.

1.    **Jurisdiction**

    a.    **Applicable Law**

In this case, the juvenile court exercised its jurisdiction under subdivisions (b)(1), (d), and (j) of section 300.  " 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' "  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)  As in *In re I.J.*, subdivision (j) of section 300 is the subdivision here "that most closely describes the situation regarding [son].  Accordingly, we will focus on that subdivision."  (56 Cal.4th at p. 774.)

Under subdivision (j), a juvenile court may assert dependency jurisdiction and declare a child a dependent of the court when "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions.  The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the

11

age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."  (§ 300, subd. (j).)

"The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who *are at risk of that harm*.'  (§ 300.2, italics added.)  'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' "  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)  " 'The purpose of dependency proceedings is to prevent risk, not ignore it.' "  (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)

### b. Standard of Review

We review the juvenile court's jurisdictional findings under the substantial evidence standard of review.  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)  " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings [and disposition order] of the trial court." ' "  (*Ibid.*)

### c. Substantial evidence supports dependency jurisdiction.

As we explained in our opinion addressing parents' first appeal, father's sexual abuse of his oldest daughter, son's half sibling, "was unquestionably ' "aberrant in the extreme" ' " and father " 'fundamental[ly] betray[ed] . . . the appropriate relationship between generations' and 'abandon[ed] and contravene[d]' " his parental role. (*In re W.Z.*, *supra*, B309689; *In re I.J.*, *supra*, 56 Cal.4th at p. 778.) As such, the rationale of our Supreme Court in *In re I.J.* applies here. (56 Cal.4th at pp. 778, 780.) Indeed, as to their eight older children (including, at the time, newborn twin girls), mother and father did not challenge the juvenile court's jurisdictional findings based on father's abuse of his oldest daughter and mother's failure to protect. (*In re W.Z.*, *supra*, B309689.)

In addition to father's aberrant-in-the-extreme behavior and mother's failure to protect, the record includes additional evidence supporting the juvenile court's jurisdictional findings as to son. Although since we filed our earlier opinion, father has completed a parenting program, he has failed to address (as ordered by the juvenile court), or take any responsibility for, his aberrant behavior. Instead, father continues to deny he has done anything wrong and instead casts blame on others. Similarly, although mother has completed a parenting program, she has not participated in any meaningful way in her court-ordered individual counseling sessions and has not expressed insight into, or responsibility for, Department involvement with her family. Indeed, mother and father participated only minimally in the more recent proceedings concerning son. Moreover, the record before us now also includes Dr. Wen's assessment of mother and

13

father's undeniable mental health issues.  Dr. Wen expressed serious concerns with mother and father's ability to parent a young child, noting " 'mental health and safety concerns for any minors under their care.' "

Thus, since parents' first appeal, in which they did not challenge the juvenile court's jurisdictional findings as to their other children, there has been no meaningful change.  Indeed, the record reveals not only that parents continue to display the same concerning behaviors but also a mental health professional has reported serious concerns with mother and father parenting a young child.

Finally, we are not persuaded by father's argument, including his extensive review of cases addressing dependency jurisdiction based on sexual abuse of a child, that son "did not fall within the parameters of the 'at risk' categories established by the appellate courts of this state."  Significantly, father provides an inaccurate and incomplete recitation of the facts.  Contrary to father's representations, the record includes evidence father raped other women in China and was incarcerated there for three years as a result.  (*In re W.Z.*, *supra*, B309689.)  Also, contrary to father's statements, the record includes evidence father may have inappropriately touched his and mother's oldest daughter.  (*In re W.Z.*, *supra*, B309689.)

We conclude the record provides substantial evidence supporting the juvenile court's jurisdictional findings as to son.

2.     **Removal**

       a.     **Applicable Law and Standard of Review**

When a child has been adjudged a dependent child within the meaning of section 300, the juvenile court "may limit the control to be exercised over the dependent child by any parent" if

14

necessary to protect the child. (§ 361, subd. (a)(1).) Section 361, subdivision (c)(1) permits the juvenile court to order a child removed from his or her parent if the court finds by clear and convincing evidence that the child is, or would be, at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. " ' "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." ' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, disapproved on another ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 (*O.B.*).) In making its determination, the juvenile court may consider the parent's past conduct as well as present circumstances. (*In re A.S.*, at p. 247.)

We review the juvenile court's removal order under the substantial evidence standard of review. (*In re Nathan E.* (2021) 61 Cal.App.5th 114, 123.) "In reviewing for substantial evidence to support a dispositional order removing a child, we 'keep[] in mind that the [juvenile] court was required to make its order based on the higher standard of clear and convincing evidence.' " (*Ibid.*; *O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012.)

b. **Substantial evidence supports the juvenile court's removal order.**

In our opinion addressing parents' first appeal, we considered the juvenile court's removal order as to parents' oldest son. (*In re W.Z.*, *supra*, B309689.) Our analysis there applies equally here. Moreover, as with our discussion above concerning the court's jurisdictional findings, events that have occurred since parents' first appeal amply support the juvenile court's removal order as to son. Significantly, in his professional opinion, Dr.

15

Wen believed " '**[Father] should not have a minor under his care**' " and " '[Mother] is unable to independently care for her children without relying on her husband." ' We are not inclined to discount Dr. Wen's analysis and findings.

Finally, we are not persuaded by parents' arguments that alternatives to removal existed. In our earlier opinion, we stated, "Any alternative plan that required even slight parental cooperation was untenable and certainly not a reasonable alternative." (*In re W.Z.*, *supra*, B309689.) The same holds true here. Parents have continued to be uncooperative and obstreperous. There is no indication they would cooperate with the Department if son remained in their home.

Father also argues that, by allowing son to remain in parents' home under Department supervision, the juvenile court could have created a "significant incentive for father to engage in services and address the problems which led to the dependency proceedings." We are not convinced. Father already had eight of his children removed from his care and was told to complete services as one step toward regaining custody. Seemingly, the prospect of having his eight older children returned to his care was not incentive enough for him to engage meaningfully in the court-ordered services.

The juvenile court's removal order is supported by substantial evidence.

**DISPOSITION**

The juvenile court's August 3, 2021 findings and orders are affirmed.

NOT TO BE PUBLISHED.


                                        LUI, P. J.

We concur:



ASHMANN-GERST, J.



HOFFSTADT, J.